UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ALAN TAYLOR,

        Plaintiff,

                                          File No.  1:03-CV-225

v.

                                          HON. ROBERT HOLMES BELL

REBECCA HUMPHRIES, Director
of the Department of Natural Resources,
in her official capacity, and
PAUL ROSE, Conservation Officer,
in his official and individual capacities,

        Defendants.

_____/

**O P I N I O N**

      This matter is before the Court on the parties' cross motions for summary judgment and presents the unusual issue of whether the Fourth Amendment prohibition against "unreasonable searches and seizures" is implicated by a state conservation officer's lawful entry on to private property and subsequent "property check" of the premises.  For the reasons stated below, the Court finds that Defendant Paul Rose did not conduct a Fourth Amendment "search" and thus, did not violate Plaintiff Alan Taylor's constitutional rights. Moreover, even were one to assume a constitutional violation occurred, Rose is entitled to qualified immunity.  Further, the Court denies Plaintiff's request for injunctive relief. Accordingly, the Court grants summary judgment in favor of Humphries and Rose and denies Taylor's motion for summary judgment.

I.

Like many Michigan residents, Plaintiff Alan Taylor maintains a recreational cottage on one of the many rural lakes in this state.  Taylor's property encompasses 240 acres on Merrill Lake and is bordered on all sides by the Manistee National Forest in rural Newaygo County, Michigan.  Taylor has a log cabin and detached garage on the property.  Neither structure is visible from a public road.  The property is completely surrounded by a fence demarcating the boundary of Taylor's property.  On the east and north property lines there is a six foot chain link fence, while along the south and west property lines there is a two strand barb wire fence.  The only entrance to the property is along a seasonal two-track road from the eastern property line.  The entrance to the property is an ungated opening in the chain link fence.  Taylor has placed two "Private Property – No Trespassing" signs at the entrance.  In addition, Taylor has installed a motion activated security camera system to monitor his property.[1]  The events giving rise to this litigation were recorded by the surveillance system.  A videotape of the events has been filed with the Court and has been reviewed in the preparation of this opinion.

During the early afternoon of February 20, 2002, Defendant Paul Rose, a longtime conservation officer with the state Department of Natural Resources, drove to Taylor's

---

[1]At oral argument, Plaintiff's counsel explained that Taylor splits his time evenly between his cottage and primary residence.

property to investigate a complaint regarding fence construction on the property.[2]   Upon arriving at the entrance to Taylor's property he observed tire tracks and footprints in the snow.  The tire tracks stopped at the entrance, however, the footprints appeared to lead in the direction of Taylor's residence.  The footprints dissipated as Rose continued up the driveway due to the limited snow cover.  Rose then drove up the driveway, parking his truck directly in front of the front door of the home.  Rose immediately noticed that the curtains in the windows were not drawn.  In his experience as a conservation officer, most absentee owners of rural homes close their curtains when not present and intruders open them in order to observe approaching vehicles.  Thus, Rose became concerned that a trespasser may be on the property and he decided to perform a property check to determine if an intruder had entered the home.

Rose exited his truck and called out to determine if anyone was home.  Upon receiving no answer in reply, he walked around the west side of the home along a paved area between the garage and residence.  Rose first looked into the west windows of the home.  Rose then proceeded along the north side of the home peering into the windows.  Rose then returned to the west side of the home where he appeared to rattle the side door knob.  Thereafter, Rose

---

[2]By statute, Michigan has made it unlawful to erect a barrier denying ingress or egress to an area where the lawful taking of animals may occur.  *See* MICH. COMP. LAWS § 324.40112(2)(d).  In addition, also by statute, conservation officers are authorized to "enter into or upon any private or public property . . . for the purpose of patrolling, investigating, or examining" when they have probable cause to believe a violation of the fish and game statutes has occurred.  MICH. COMP. LAWS § 324.1602(1).  "Private property" as used in the statute does not include dwellings or the curtilage of a dwelling.

walked across the paved area to the east side of the garage in order to check the side garage door. Rose then walked around the entirety of the garage where the security camera is unable to view his actions.[3] Rose then returned to the front door on the south side of the home where he left his business card and requested that Taylor contact him. Rose then proceeded along the front of the home looking in two additional windows. Rose then returned to his truck and left Taylor's property. According to the time stamp on the security camera videotape, Rose was on the property for approximately five minutes.

Thereafter Taylor found Rose's business card and contacted him. At the time of the discussion, Taylor had not reviewed the security videotape of Rose's visit to the property. During the conversation, the two men discussed the fence complaint. Rose informed Taylor there was no violation and offered Taylor his assistance in the event of any future trespassing problems. After speaking with Rose, Taylor reviewed the videotape and became outraged with Rose's conduct on his property. After contacting his attorney, Taylor sent a letter to then-director of the Department of Natural Resources, K.L. Cool, notifying him of Rose's allegedly unconstitutional conduct. Taylor enclosed a legal memorandum from his counsel, still photographs of Rose at Taylor's property, and the videotape. Director Cool responded

---

[3]Plaintiff explains that there are three windows along the side of the garage out of view of the camera. Plaintiff assumes that, consistent with his prior conduct, Rose looked into these windows. This is not an unreasonable assumption to make and the Court will assume that, as part of his security check, Rose looked into the garage windows.

by letter explaining his determination that Rose had not acted in an improper manner by investigating Taylor's home.

> "As is customary for Officer Rose, as well as with many northern Michigan law enforcement officers, a brief property check was done.  These inspections are done as a courtesy to remote property owners, and generally include a check of doors and windows to assure they are secure, and an un-intrusive view into the building's interior when possible to check for any signs of damage or problems.  I believe that this practice provides an important public service . . . [Officer Rose's] actions, as recorded on your videotape, were consistent with his responsibility to investigate the allegation of the fencing violation, as well as his desire to help assure the security of your valuable property.  In conclusion, I am sorry that you feel Officer Rose's actions were inappropriate.  You may be assured that no further security checks of your property will occur absent your request."

Exhibit E, May 28, 2002 Letter (Docket #25).  After receiving Director Cool's letter, Taylor filed the present suit seeking nominal damages and injunctive relief for violation of his United States constitutional right to be free from unreasonable searches and seizures.  In addition, Taylor asserts a claim against the Director of the Department of Natural Resources for failure to properly train conservation officers.[4]  Taylor has also filed a state law trespass claim against Rose.  Before the Court are the parties' cross motions for summary judgment.

## II.

The standards upon which the Court evaluates a motion for summary judgment do not change simply because the parties present cross motions.  *Relford v. Lexington-Fayette*

---

[4]On June 1, 2004, Rebecca A. Humphries replaced K.L. Cool as the Director of the Department of Natural Resources.  By order dated August 19, 2005, Ms. Humphries was substituted as a defendant in this case for K.L. Cool.  *See Taylor v. Rose, et. al.*, 1:03-CV-225 (Docket #31).

*Urban County Gov't*, 390 F.3d 452, 456 (6th Cir. 2004). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005); *Layne v. Bank One, Ky, N.A.*, 395 F.3d 271, 275 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in the favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005).

III.

Section 1983 imposes civil liability on any person who, acting under color of state law, deprives another person of the "rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983, *see also Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005).  In this case, Taylor contends Rose, while acting under color of state law, violated the Fourth Amendment by conducting an unreasonable search of his home.  Rose concedes that he was acting under color of state law in his capacity as a state conservation officer.  Nevertheless, Rose denies that his conduct implicated the Fourth Amendment and also raises the affirmative defense of qualified immunity.  The Court will first evaluate the merits of Rose's qualified immunity defense.

"Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 125 S. Ct. 596, 599 (2004).  Put another way, a state official sued in his individual capacity, such as Rose, performing a discretionary function is "shield[ed] . . . from civil damages liability as long as [his] actions could reasonably have been thought consistent with the rights [he is] alleged to have violated." *Myers*, 422 F.3d at 352 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

The qualified immunity analysis requires a two-part inquiry evaluating two closely linked questions.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  First, in the light most favorable to the plaintiff, "do the facts alleged show the officer's conduct violated a

constitutional right?"  *Saucier*, 533 U.S. at 201.  Second, if a constitutional right was violated, "the next, sequential step is to ask whether the right was clearly established."  *Id.* The Supreme Court has cautioned that courts must determine whether a constitutional violation has occurred and cannot assume such a violation and then proceed to an evaluation of whether the right was clearly established.  *Id.* at 200 ("the first inquiry *must be* whether a constitutional right would have been violated on the facts alleged.") (emphasis added). Accordingly, the Court will first consider whether Rose's conduct violated the Fourth Amendment.[5]

The circumstances of this case require the Court to evaluate the core concepts of the Fourth Amendment.  The Fourth Amendment provides that "[t]he right of the people to be

---

[5]Before proceeding further, the Court wishes to note that such a rigid requirement seems unduly restrictive.  First, requiring that the federal courts immediately tackle the constitutional question is contrary to the general rule of constitutional adjudication.  *See e.g.*, *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (A court "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."). Second, in a case such as this, when the constitutionality of the state official's conduct is a close, difficult, and highly fact-intensive inquiry and the "clearly established" question is comparatively easy to resolve, it would seem that the most reasonable course would be to avoid making unnecessary pronouncements on constitutional issues.  *See e.g., County of Sacramento v. Lewis*, 523 U.S. 833, 859 (1998) (Stevens, J., concurring) (confronting the constitutional question at the outset "is sound advice when the answer to the constitutional question is clear.  When, however, the question is both difficult and unresolved, I believe it wiser to adhere to the policy of avoiding the unnecessary adjudication of constitutional questions."); *id.* at 858-59 (Breyer, J., concurring) (same); *Lyons v. City of Xenia*, 417 F.3d 565, 580 (6th Cir. 2005) (Sutton, J., concurring) ("While I see the virtue in telling lower courts that they should generally answer the constitutional question before the clearly established question, I wonder whether it makes sense to mandate that they do in all cases, no matter the costs, no matter the ease with which the second question might be answered.").

secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and [that] no Warrants shall issue, but upon probable cause . . . ."  U.S. CONST. amend. IV.  As the text indicates, the protections of the Fourth Amendment are triggered only upon the occurrence of a "search."  *See Widgren v. Maple Grove Township*, No. 04-2189, ___ F.3d ___, 2005 WL 3068197 (6th Cir. Nov. 17, 2005) ("The Fourth  Amendment's protections hinge on the occurrence of a "search" . . . .").  A "search" is defined in terms of whether a person has a "constitutionally protected reasonable expectation of privacy."  *Oliver v. United States*, 466 U.S. 170, 177 (1984) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).  A "reasonable expectation of privacy" is analyzed under a two part test: 1) "has the individual manifested a subjective expectation of privacy in the object of the challenged search?" and 2) "is society willing to recognize that expectation as reasonable?"  *California v. Ciraolo*, 476 U.S. 207, 211 (1986).

Taylor quite clearly manifested a subjective expectation of privacy in the interior of his home.  The home was placed in a remote area and was not visible from any public area.  Thus, the Court will turn to the second prong of the *Katz* test: "is society willing to recognize [plaintiff's] expectation [of privacy] as reasonable?"  *Ciraolo*, 476 U.S. at 211.  In a recently published case, the Sixth Circuit explained the considerations addressed by *Katz*' second prong:

> The second prong of the *Katz* test generally addresses two considerations.  The first focuses on "what a person had an expectation of privacy *in*, for example, a home, office, phone booth or airplane."  *Dow Chemical Co. v. United States*, 749 F.2d 307, 312 (6th Cir. 1984), *aff'd*, 476

9

U.S. 227 (1986) (emphasis in original); *see also Oliver v. United States*, 466 U.S. 170, 178 (1984) (noting "our societal understanding that certain areas deserve the most scrupulous protection from government invasion"); *United States v. White*, 401 U.S. 745, 786 (1971) (Harlan, J., dissenting) (assessing "the individual's sense of security"); Wayne R. LaFave, 1 *Search and Seizure: A Treatise on the Fourth Amendment* § 2.1(d) (4th ed. 2004). This inquiry centers on "whether the human relationships that normally exist at the place inspected are based on intimacy, confidentiality, trust or solicitude and hence give rise to a 'reasonable' expectation of privacy." *Dow Chemical Co.*, 749 F.2d at 312.

The second consideration examines "what the person wanted to protect his privacy *from*, for example, non-family members, non-employees of a firm, strangers passing by on the street or flying overhead in airplanes." *Id.* (emphasis in original); *see also Oliver*, 466 U.S. at 178 (discussing "government invasion and "arbitrary government interference"); *White*, 401 U.S. at 762 (asking whether, in a particular situation, "self-restraint by law enforcement officials [is] an inadequate protection); *cf. Kyllo*, 533 U.S. at 34 (addressing the limits of the "power of technology to shrink the realm of guaranteed privacy); *Olmstead v. United States*, 277 U.S. 438, 474 (1928) (Brandeis, J., dissenting) (warning of "[t]he progress of science in furnishing the government with means of espionage"). This inquiry, therefore, focuses on the government intrusion at issue.

*Widgren*, 2005 WL 3068197, *2. In this case, Taylor had an expectation of privacy in his home. Clearly, a home, and particularly the interior of the home, is a place in which the most intimate, confidential details of human relationships exist, and consequently gives rise to an expectation of privacy. *See e.g., Kyllo*, 533 U.S. at 34 ("[I]n the case of the search of the interior of homes -- the prototypical and hence most commonly litigated area of protected privacy -- there is a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that *exists*, and that is acknowledged to be *reasonable*") (emphasis in original); *Payton v. New York*, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold

10

may not reasonably be crossed without a warrant."); *Silverman v. United States*, 365 U.S. 505, 511 (1961), ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."). Thus, Taylor's expectation of privacy in the interior of his home implicates the core of the Fourth Amendment's protection.

Nevertheless, the Court must next examine the government intrusion at issue in this case. *Widgren* at *7 (quoting *Dow Chemical Co.*, 749 F.2d at 312). "Assessing the degree of intrusion requires addressing both the *methods used* and the *purpose for the intrusion*." *Id*. (emphasis added). A review of the methods used in this case indicates that Rose's actions involved a minimal degree of intrusion. Rose used naked-eye observations unaided by technological enhancements. *See Kyllo*, 533 U.S. at 31, 33, 40 (noting that police methods range from "ordinary visual surveillance" to "technological enhancement of ordinary perception"). Rose, rather unobtrusively, looked into open windows without craning his neck, bending over, or squatting. *See Widgren*, at *7 (describing bending over, squatting, and craning officer's neck as "extraordinary measures" that are "generally more intrusive") (quoting *James v. United States*, 418 F.2d 1150, 1151 n. 1 (D.C. Cir. 1969)). To be sure, Rose did cup his hands against the window in order to view the interior of the home, however, such an action is not extraordinary and is more in line with the actions of a "reasonably curious neighbor." *Id*. Further, Rose did not engage in any "dirty business" while on the property. *Id*. (noting that "dirty business" such as trickery and illegal acts often

11

accompanies unjustifiable government intrusion) (citing *Olmstead v. United States*, 277 U.S. 438, 470 (1928) (Holmes, J., dissenting)).  He was lawfully on the property, he made his observations during the daytime, and left his business card alerting Taylor to his presence.[6] Moreover, Rose confined his movements to areas that were reasonably necessary to determine if an intruder had entered the home or garage.  Finally, the duration of Rose's presence on Taylor's property was short, lasting approximately five minutes.  In sum, the methods used indicate a low degree of intrusion.[7]

Turning to Rose's purpose for entering the property and conducting a "property check."  "Like the methods used, the purpose for the interference bears upon the intrusiveness of government action."  *Id*.  In this case, the parties do not dispute that Rose's initial entry onto the property was permissible in order to investigate the fencing complaint. Taylor contends that Rose exceeded this permissible purpose by proceeding to the house and looking into the windows.  Taylor, however, overlooks the undisputed evidence that upon

---

[6]The leaving of the business card is not an insignificant fact.  If Rose had made his observations and then left without disclosing his presence, a stronger case could be made that he engaged in "dirty business" by surreptitiously viewing Plaintiff's home.  Rose, however, left his business card, disclosing his presence on the property to Plaintiff.  This fact provides strong support for the conclusion that Rose's methods involved a justifiable and minimal amount of intrusion.

[7]In reaching this conclusion, the Court recognizes that, in conducting his observations, Rose likely breached the curtilage of the home.  This breach, however, is mitigated by the minimally intrusive methods used and the fact that the purpose was to conduct a "community caretaking" function, as opposed to a criminal or administrative inspection.  *See Widgren*, *9 ("[T]he Fourth Amendment cannot be stretched to bar categorically all government breaches of the curtilage.").

arriving at the home Rose discovered footprints leading toward the home and noticed that the curtains of the home were open. Based on Rose's experience as a conservation officer, these circumstances indicated that an intruder may be on the property. Rose Aff. ¶ 5, Exhibit 1, Def.'s Res. Br. (Docket #27). Thus, Rose reasonably decided to conduct a "property check" to determine if the home was secure. Therefore, Rose's purpose in observing the home was to insure that a trespasser was not in the home.

Rose's purpose does not fit neatly into the traditional purposes for a search. The purpose of this investigation is significantly less intrusive than a criminal investigation. In conducting the "property check," Rose was not investigating a crime or searching for evidence but was merely quickly verifying that the home was secure. A criminal investigation, on the other hand, is often conducted at varying times of night and day, requires a greater amount of time, a higher degree of intrusion, and brings "damage to reputation resulting from an overt manifestation of official suspicion of crime." Wayne R. LaFave, 5 *Search and Seizure: A Treatise on the Fourth Amendment* § 10.1(b) (4th ed. 2004). In this case, Rose's actions involved a low degree of intrusion, a short period of time, and were conducted during the middle of the afternoon. The purpose for Rose's intrusion certainly did not rise to the level of a criminal investigation.

The purpose of Rose's investigation also does not fit within an administrative or regulatory inspection. *See e.g., Camara v. Mun. Court of the City & County of San Francisco*, 387 U.S. 523 (1967) (adopting a relaxed probable cause requirement for entry

into homes for administrative safety inspections), *Widgren* (holding that property tax assessor did not conduct a search by conducting an administrative inspection of the exterior of a home for the purpose of tax assessment); *Artes-Roy v. City of Aspen*, 31 F.3d 958 (10th Cir. 1994) (holding building inspector did not conduct a Fourth Amendment search by entering a home for the purpose of enforcing a stop work order and to issue citations to workmen). Unlike an administrative investigation, Rose's purpose in observing the home was not to issue a citation, investigate a regulatory violation, or assess any other punitive measure. In that sense, Rose's actions were less intrusive than an administrative inspection. Moreover, unlike the *Camara* line of cases, Rose did not enter the home but merely viewed it from outside. *See Widgren* at *8 n. 3 (noting that *Camara* presumes an entry of a structure); *Artes-Roy* (building inspector entering a home to enforce stop work order and issue citations).

Based upon the circumstances, it appears to the Court that Rose's actions can best be described as falling under the purpose of "community caretaking." The Supreme Court has described community caretaking functions of law enforcement officers as those actions that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *See Cady v. Dombrowski*, 413 U.S. 433, 441 (1973) (holding that a warrantless search of the trunk of an automobile was not unreasonable under the Fourth Amendment). Other courts, applying this "community caretaking function," have held that the Fourth Amendment was not violated by entrance of the police into a home. *See e.g., United States v. Bradley*, 321 F.3d 1212 (9th Cir. 2003) (officers lawfully entered a

14

home to locate child whose mother had just been arrested on drug charges); *United States v. Rohrig*, 98 F.3d 1506 (6th Cir. 1996) (officer permitted to enter a home at two in the morning after neighbors complained about loud music coming from inside). In this case, the purpose of Rose's actions was not to detect, investigate, or acquire evidence of crime. Rather, Rose encountered a situation in which he reasonably believed that an intruder could be on the premises. In order to insure that the property was secure he conducted a brief check of the structures on the property where an intruder would likely go. This "community caretaking" action was a slight intrusion, indeed, it was less of an intrusion than other "community caretaking" cases that involve entry into the home. Therefore the Court finds that the intrusion in this case was small and for the reasonable "community caretaking" purpose.

While the Court recognizes that Taylor's expectation of privacy in the interior of his home is significant, based upon the reasonable methods used, the slight intrusion, and the "community caretaking" purpose of Rose's actions, the Court finds that Rose did not conduct a "search" within the meaning of the Fourth Amendment. Rose lawfully entered Taylor's property, discovered circumstances that reasonably indicated an intruder may be present, and proceeded to conduct a brief, slightly intrusive "property check" to insure the home was secure. Such activity does not rise to the level of a "search" in that it does not implicate an expectation of privacy that society recognizes as reasonable.

Finally, in this fact specific and unusual case, the Court returns to the fundamental principles underlying the Fourth Amendment. While the home is given explicit protection

under the Fourth Amendment, it is not protected from *all* government intrusion, only *unreasonable* intrusions.  *See* U.S. CONST. amend. IV, *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990) ("What [respondent] is assured by the Fourth Amendment itself, however, is not that no government search of his house will occur unless he consents; but that no such search will occur that is 'unreasonable.'");  *Silverman*, 365 U.S. at 511 ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from *unreasonable* governmental intrusion.") (emphasis added).  This brief, slightly intrusive observation of Taylor's home was not unreasonable given that it occurred in the middle of the afternoon, the methods used did not rise above those of a curious neighbor, Rose's initial presence on the property was lawful, and upon viewing suspicious circumstances he conducted his observations for the purpose of insuring that the property was safe and secure.  *See e.g., United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995) ("The less intrusive a search, the less justification is required . . . Entry into a domicile usually requires a search warrant, which can be had only on probable cause, but quick inspections may be justified by lower degrees of suspicion.") (citation omitted).  Thus, Rose's actions do not rise to the level

of a "search" and do not implicate the Fourth Amendment.[8]   Accordingly, the Court concludes that Taylor has failed to allege a constitutional violation.

Even assuming, the alleged conduct was a constitutional violation, it is clear that this conduct did not violate a clearly established right.  *Saucier*, 533 U.S. at 201.  As the foregoing discussion illustrates this case implicates many of the core concepts of Fourth Amendment jurisprudence.  But, this case does not fit neatly into any previous category of Fourth Amendment law.  This is best demonstrated by the fact that neither side has been able to provide any prior case law analogous to this situation.  Nevertheless, the Supreme Court has held that government officials can be on notice that their conduct violates established law "even in novel factual circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Anderson*, 483 U.S. at 640 (holding that it is not necessary that the action in question have been previously held unlawful, only that "in the light of pre-existing law the unlawfulness [] be apparent.").

Plaintiff contends that Rose is not entitled to qualified immunity because any reasonable government official is aware of the Fourth Amendment and it is well established that a warrantless search is unreasonable absent probable cause and exigent circumstances.

_____

[8]Moreover, a strong argument can be made that Rose's actions do not even rise to the level of the dictionary definition of a "search."  To "search" means "[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as to search the house for a book; to search the wood for a thief."  *See Kyllo*, 533 U.S. at 32 n.1 (quoting N. Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 66 (1828) (reprint 6th ed. 1989)).  In this case, the record indicates that Rose's observations did not involve looking for anything but merely involved insuring the security of the property.

While Plaintiff is correct that the broad concepts of the Fourth Amendment are clearly established law, his argument fails precisely because he has alleged nothing more than a broad, general violation of the right.  This is not sufficient to overcome the qualified immunity shield.  *See Brosseau*, 125 S. Ct. at 599 ([The clearly established law question] "must be undertaken in light of the *specific context* of the case, not as a broad general proposition.") (quoting *Saucier*, 533 U.S. at 201) (emphasis added).  Rather, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Saucier*, 533 U.S. at 202 (quoting *Anderson*, 483 U.S. at 640).  Thus, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*.  Although the officer's subjective intent is not relevant to this inquiry, the Supreme Court has clarified that the reasonableness of the officer's action often requires an "examination of the information possessed by the searching officials." *Anderson*, 483 U.S. at 641.

In this case, it would not be clear to a reasonable officer that Rose's conduct was unlawful given the situation that he confronted.  A brief review of the situation Rose confronted demonstrates that whether the Fourth Amendment was violated would not be clear to a reasonable officer.  As both parties agree, Rose lawfully entered Taylor's property to investigate a fencing complaint within the jurisdiction of the state Department of Natural Resources.  Further, Taylor has not disputed that, upon arriving at the property Rose

18

observed footprints leading toward the house and noticed that the window shades were open. Based upon Rose's experience as a conservation officer with rural recreational cabins, he suspected that an intruder may be on the premises and that a property check was necessary. Given these circumstances a reasonable officer could conclude that this non-criminal investigation did not violate Taylor's constitutional rights.

Plaintiff also relies upon *Daughenbaugh v. City of Tifin*, 150 F.3d 594 (6th Cir. 1998), to argue that it is clearly established that a detached garage and backyard are curtilage, and thus a reasonable officer in Rose's situation would understand that a search of these areas would be unlawful.  In *Daughenbaugh*, the Sixth Circuit determined that although police officers conducted a warrantless search of plaintiff's curtilage, they were entitled to qualified immunity because the contours of curtilage were not sufficiently clear at the time of the search. 150 F.3d at 603.  In reaching this conclusion, the court noted that in light of that case and *United States v. Jenkins*, 124 F.3d 768 (1997) (holding that a backyard is part of the curtilage), "the police will be precluded in the future from relying on qualified immunity as a defense to warrantless searches of garages and backyards in situations similar to those herein."  *Id*.

Taylor's reliance upon *Daughenbaugh* is misplaced.  First, *Daughenbaugh* is based on the finding that the officers were conducting a "search" under the Fourth Amendment. In this case, although it is a close question of law, no "search" occurred.  Second, in *Daughenbaugh*, the officers entered plaintiff's property in search of evidence connected to

19

a string of burglaries.  This is significantly different from the situation involved in this case.

Rose is not a police officer, nor was he, at any time, conducting a criminal investigation.  As

stated previously, he was lawfully on the property and reasonably believed that a brief check

of the property was necessary to insure that the home was secure.  Although it may be

arguable whether Rose's conduct violated Taylor's rights, it is clear that a reasonable

conservation officer, possessing the information that Rose had, would not understand that

a brief property check for the purpose of insuring the security of the home violates the

Constitution.  Accordingly, Rose is entitled to qualified immunity.

Taylor also seeks injunctive relief against Humphries in her official capacity as

director of the Department of Natural Resources.  Taylor contends that the Department of

Natural Resources adopted a policy or custom permitting Rose's allegedly unconstitutional

conduct.  While the Court's determination that Rose's conduct did not violate the Fourth

Amendment essentially precludes a finding that the Department of Natural Resources

adopted a policy permitting unconstitutional conduct, Taylor's suit is also precluded because

he lacks standing to assert a claim for prospective injunctive relief.

The jurisdiction of the federal court is limited by the threshold constitutional

requirement of an actual case or controversy.  See U.S. CONST. art. III, § 2.  "Allegations of

possible future injury do not satisfy the requirements of Art. III.  A threatened injury must

be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149,

158 (1990) (internal quotations omitted).  Further, "[p]ast exposure to illegal conduct does

not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons v. City of Los Angeles*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).  In *Lyons*, plaintiff sought a permanent injunction against defendant City enjoining it from using chokeholds during an arrest unless the victim was threatening the immediate use of deadly force.  461 U.S. at 98.  The Court held plaintiff failed to establish a case or controversy justifying the injunction sought because his standing depended on whether he was likely to suffer future injury from a police officer's chokehold.  *Id.* at 105.  The Court held plaintiff lacked standing because he was unable to show an imminent threat of future police brutality. *Id.*   Ultimately, the Court concluded "[a]bsent a sufficient likelihood that he will again be wronged in a similar way, [plaintiff] is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional."  *Id.* at 111.

In a similar manner, Taylor's request for injunctive relief fails.  Taylor has alleged that a custom or practice of the Department of Natural Resources is unconstitutional.  Like the plaintiff in *Lyons*, Taylor's standing hinges on whether he is likely to suffer future injury from the allegedly unconstitutional policy.  And as in *Lyons*, Taylor has failed to show any likelihood of future injury.  At best, Taylor has shown that he was subject to a single instance of allegedly unconstitutional activity and as a homeowner, could be subject to future injury.

21

But "while past illegal conduct might constitute evidence . . . regarding whether there is a real and immediate threat of repeated injury, 'where the threat of repeated injury is speculative or tenuous, there is no standing to seek injunctive relief.'" *Blakely v. United States*, 276 F.3d 853, 873 (6th Cir. 2002) (quoting *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 833 (6th Cir. 2001)).  Taylor has not shown anything more than a speculative threat of repeated injury.[9]  Like the plaintiff in *Lyons*, without any evidence of a threat of repeated injury, Taylor is no more entitled to an injunction than any other homeowner in the State of Michigan who asserts nothing more than that a certain law enforcement practice is unconstitutional.  461 U.S. at 111.  Accordingly, Taylor's request for injunctive relief is denied.

Taylor's remaining claims include a state law trespass claim against Rose and violations of the Michigan constitution against Rose and Humphries.  In light of the dismissal of Taylor's federal claims, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims.  *See* 28 U.S.C. § 1367(c)(3) (2005); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the

---

[9]In fact, in the letter upon which Taylor pins his request for injunctive relief, then-director Cool explained that "[y]ou may be assured that no further security checks of your property will occur absent your request."  Exhibit E, Pl.'s Br. Mot. Summ. J. (Docket #25).  Although not conclusive, this is at least some evidence showing that the likelihood that Taylor will suffer a repeat injury is speculative.  Taylor has not provided any evidence to the contrary demonstrating that he, in fact, faces an imminent threat of injury.

state claims . . . .").  Accordingly, Rose and Humphries' motion for summary judgment is granted.  Conversely, Taylor's motion for summary judgment is denied.  An order will be entered consistent with this opinion.


Dated:  ____November 29, 2005____          /s/ Robert Holmes Bell_____
                                           ROBERT HOLMES BELL
                                           CHIEF UNITED STATES DISTRICT JUDGE